## JOHN H. WILSON
v.
## GEORGE M. D. HAKES ET AL.

*Mortgages—Insurance for Benefit of Mortgagee—Additional Insurance —Equitable Lien of Mortgagee—Assignment of Policies—Rights of Assignee.*

1.  An agreement by a mortgagor to insure for the benefit of his mortgagee, gives the latter an equitable lien on the proceeds of all policies taken out by the mortgagor, to the extent of his debt, whether they are taken out for his benefit or not.

2.  When mortgaged property is covered by insurance and destroyed by fire, the insurance money represents the property under the mortgage and goes to the mortgagee, to the extent of his debt.

3.  If an insurance company after notice of the mortgagee's claim pays the insurance to others, it does so at its peril.

4.  The fact that the mortgagee knows that additional insurance is taken out for the benefit of others, and makes no objection, does not affect his rights so long as others are not put in a worse position by his silence.

5.  Where insurance policies for the mortgagee's benefit contain the *pro rata* clause, the taking out by the mortgagor of additional insurance for the benefit of others, is a breach of a provision in the mortgage that he will do nothing to change or incumber the lien.

6.  The assignee of an insurance policy takes only an equitable assignment, and acquires no greater rights than his assignor.

[Opinion filed May 28, 1890.]

APPEAL from the Circuit Court of Rock Island County; the Hon. JOHN J. GLENN, Judge, presiding.

Messrs. C. L. WALKER and G. W. & J. T. KRETZINGER, for appellant.

Messrs. IRA O. WILKINSON and ADAIR PLEASANTS, for appellees.

C. B. SMITH, J.  This was a proceeding in equity, in the Rock Island Circuit Court.  The proceedings were had upon an original bill and answers thereto, and upon a cross-bill and answers thereto.  Upon a hearing, the court rendered a decree not satisfactory to any of the parties, and both parties to the original and cross-bills have appealed to this court and assigned errors upon the record.  The record is very voluminous and the argument of counsel elaborate.  In the view we take of the case it will not be necessary to a correct understanding of the case and the legal principles involved, to go at length into all the allegations of the bill, cross-bill and answers, nor to give a detailed account of all the facts appearing in the evidence.

The substantial and material facts disclosed in this record, upon which the rights of the parties turn, are about these: the Rock Island Paper Company, one of the defendants, was a corporation, existing under the laws of this State, on the 20th day of December, 1877.  On that day the Paper Company borrowed from John H. Wilson $10,000, evidenced by ten promissory notes of $1,000 each, with interest at ten per cent per annum.

To secure this loan the company executed a trust deed to T. J. Robinson, covering all its land, buildings and machinery, and everything appurtenant thereto.  This $10,000 loan seems to have been made up of two loans, each loan to include five of these $1,000 notes, but they were all secured by the trust deed made to Robinson on the same day.  This trust deed was made for the benefit of Wilson as *cestui que trust.*  It was recited in said trust deed as follows: "And whereas, the said party of the first part is now improving the mill property owned by it, and hereinafter described, and is about to purchase machinery for the mill now erected thereon, and will be obliged to incur indebtedness for that purpose, and is desirous of securing such indebtedness to the amount of $5,000, making altogether the sum of $10,000 secured by these presents."

On the 3d of July, 1878, the Paper Company made another trust deed on the same premises, to secure five $1,000 bonds or notes bearing that date, payable to Charles A. Walker as trustee, for the benefit of the legal holder of these five bonds. These bonds were due five years after date, at ten per cent per annum.     These last five bonds were sold to John H. Wilson. It does not appear very clearly just at what time Mr. Wilson became the owner of these five bonds, but he purchased them directly from the officers of the company, and paid the full face value for them.

Only $5,000 of the first $10,000 loan seems to have been paid on the date of the execution of the first trust deed and the notes.     The remaining five notes were sold to Mr. Wilson, or, at least, delivered to him, and the money paid to the company some time thereafter.

But we understand from the abstract that all of the ten notes and the trust deed executed to Robinson were executed on the same day, and that the whole series of ten notes was secured by the first trust deed.     The first trust deed was recorded December 27, 1877, and the second one July 11, 1878.     Each of these trust deeds contained the following provisions, viz.:  "The party of the first part further agrees for itself and its assigns to and with the party of the second part, trustee as aforesaid, his heirs and assigns, that it will at all times hereafter, until the indebtedness secured by this trust deed is fully paid, pay and discharge all taxes assessed on said premises, with the appurtenances and machinery aforesaid; that it will keep said premises and machinery insured in some one or more responsible insurance companies in an amount sufficient to secure said indebtedness."

In another claim of said trust deed it is provided that "In consideration of the premises, the party of the first part for itself and its assigns, covenants and agrees to and with the said party of the second part, his heirs and assigns, that during the continuance of the lien secured by this trust deed, it will not do or cause to be done anything whereby the value of the premises hereby conveyed shall be in any manner impeached or affected, and the lien hereby created changed or incumbered."

In compliance with the above recited covenants in these trust deeds, the Paper Company, soon after the trust deeds were executed, took out insurance to the amount of $10,000, which was made payable to Robinson, trustee, in the first trust deed, in case of loss by fire, and also took out $5,000 insurance, payable to Walker, trustee in the second mortgage, aggregating $15,000, the same being for the benefit of John H. Wilson as *cestui que trust*. This amount of insurance for Wilson was kept good until the property was destroyed by fire on March 9, 1883.

After the above named policies were taken out on the mortgaged property and machinery of the Paper Company for the benefit of Wilson, the Paper Company took out other policies of insurance on the same property, aggregating about $15,000 over and above those taken out for the benefit of Wilson. After these later policies were taken out by the Paper Company and paid for by it, the company itself provided for the payment of losses, if any, under such policies, to be made to certain persons named on a slip of paper, as their interest might appear, pasted on the face of the policies. Twenty-five hundred dollars in value of this subsequent insurance was, in the manner above indicated, payable to S. S. Guyer. Five thousand dollars was in the same manner made payable to S. A. Main. Twenty-five hundred dollars in the same manner made payable to George M. D. Hakes, and $5,000 in the same manner payable to Holmes Hakes.

During all these transactions, from the execution of the trust deeds, Holmes Hakes was president of the Paper Company, George M. D. Hakes a director and stockholder, and S. S. Guyer was also a director and stockholder of the said company. George Hakes was the son of Holmes Hakes.

After the property covered by the trust deeds and the various insurance policies was destroyed by fire, Holmes Hakes assigned his interest in the policies so made payable to him to William T. Riggs, and George M. D. Hakes also assigned his interest in the policies so made payable to him to one Bentley.

On the 9th day of June, 1883, the property covered by these insurance policies and by the two trust deeds took fire and was entirely destroyed. The various insurance policies, amounting to $35,000, were then in force.

All of these policies of insurance contained clauses providing that in case there should be other insurance effected on the buildings, then each should only be liable for its *pro rata* share of the total loss in case of fire. After the buildings and property were destroyed by fire, appraisement of the value of the buildings and property was had, resulting in fixing the total loss sustained by the Paper Company at $21,063.54.

The amounts of the several policies were scaled down to about sixty per cent of their face value in order to raise this sum of money and make them all bear their equal proportion of the loss. The result of this scaling process was such, that out of the $15,000 insurance held by the company for Wilson, his policies only realized him $9,070.42.

The real estate covered by the trust deeds was sold under the power of sale and was bid in by Wilson for $3,000. After deducting the costs of the sale ($215) and adding the net proceeds to the amount received on the insurance policies, Wilson received less than $12,000 on his debt, which amounted, at the time of the decree, to something over $18,500. We have not stated the exact amount. The purpose of this bill is to subject enough of the proceeds of these various policies which were taken out after the policies for Wilson's use, to satisfy the full amount due Wilson on his two trust deeds.

There seems to be little or no controversy about the material facts.

Appellant Wilson contends that the trust deeds by their covenants created an equitable lien upon all insurance taken out by the Paper Company to an amount equal to the principal and interest of the debts secured thereby, and that where insurance was affected by the company it at once became subject to the rights of the mortgage whether the paper company so intended such insurance or not.

We think appellant Wilson is correct in his contention. It will be observed that none of these subsequent insurance pol-

icies were taken out, applied for, or paid for by the persons who now claim under them as against Wilson. None of them advanced, loaned or invested any money in or to the Paper Company in consideration of receiving this insurance or any part of it. Their claims, debts or judgments against the Paper Company (conceding them all to be *bona fide* as we do) were not incurred upon the faith or assurance that the insurance policies were to be taken out and given them for their security when they parted with their money. These various subsequent policies were all taken out and paid for by the company and assigned, as far as the company could assign them after the debts were created and in existence, and were intended as mere collateral security for prior existing debts.

But Wilson's position is wholly different. He loaned the Paper Company his money, and bought its securities upon the express condition and consideration that the company should keep him secure and safe from loss to the full amount of his principal and interest by insurance. The company binds itself to do so by the covenants in its deeds, which we have above set out.

No question arises here as to what the rights of these claimants to this fund would be, if they themselves, as creditors of the Paper Company, had taken out and paid for insurance for their own protection (in case they had any insurable interest). The Paper Company also expressly covenanted with Wilson that " it would not do or cause to be done anything whereby the value of the premises thereby conveyed should be in any manner impeached or affected and the lien hereby created, changed or incumbered."

This covenant was violated by the Paper Company when it continued to take out insurance for the benefit of its own officers and stockholders, or strangers, which, from the *pro rata* clauses in all the insurance, resulted in diminishing the value of Wilson's policies from $15,000 to $9,070.42. This was a palpable, legal fraud on the rights of Wilson, which neither the company, its officers, stockholders or directors had any right or power to do, and having no right themselves to do anything to diminish or destroy the value of the security, they

could not confer any greater right on others, who were mere volunteers, by an attempted assignment of the policies, by simply directing the payment to be made to another as his interest might appear in case of loss.

The evidence in this case clearly shows that the principal value of the premises consisted of the buildings and machinery of the company, and of its insurable value, and that it was upon this value and consideration that appellant, Wilson, parted with his money and made the loan, and upon the faith that the company would keep its covenants for full insurance and keep him secure by that means, and that it would do nothing to destroy that security. To allow this company to destroy its first $15,000 insurance made for Wilson's benefit in whole or in part by over insurance, would as effectually destroy or diminish Wilson's security as if they were permitted to make a subsequent mortgage effective to scale down the security on the first. Parties will not be allowed to do by indirection what they can not do directly.

It is earnestly insisted by counsel for appellees that the covenants to insure and to do nothing to impair the security are not covenants running with the loans, and that subsequent purchases and incumbrances in good faith and for value are not bound by record notice of these covenants. Even if this claim is true it could not be invoked in favor of the officers and directors in the company, who had actual notice of the deeds, and who ordered and directed their execution. But in the view we take of the law of this case, it is unnecessary to determine whether the covenants to insure and not to permit or suffer diminution of the security, run with the land or not.

If these policies of insurance had been or were assignable at law, so as to invest the assigns with the legal title, and had been so assigned before they became payable for value, then the question as to whether the assigns had actual or constructive notice by the record of the rights of Wilson, would become a material and important question.

But the policies of insurance were not assignable either at common law or under the statute so as to invest the assignee

with the legal title. Ill. Fire Ins. Co. v. Stanton, 57 Ill. 354. An assignee of an insurance policy can only take an equitable assignment, and he thereby gets no rights or sustains any bet_ter position than his assignor. Home Mutual Fire Ins. Co. v. Hanslien, 60 Ill. 521. The assignee takes the policy subject to the conditions it contains, and his equities confer no rights upon him as against the company or as against any other person holding a superior equity in the proceeds of the policy. The contract remains one between the original parties and the legal rights, and obligations continue at all times as between the original parties unless otherwise and mutually agreed. upon by the original parties to the contract of insurance.

It follows, therefore, that George Hakes, Holmes Hakes, Stephen Main, Mitchell & Lynd, Alexander Bentley, S. S. Guyer and Wm. T. Riggs, all held whatever interest they had in the policy of insurance subject to all the legal and binding obligations which rested upon the Paper Company, either in its contract relation with the insurance company, or its mortgage obligations and covenants conveying such funds and such policies to James H. Wilson, which had been entered into before these parties received their subsequent policies. Under the clear and express covenants in these trust deeds it was the duty of the Paper Company to hold every dollar of this insurance money for the benefit of Wilson until he was paid, and thus keep the covenants it had made with him. This proposition is too plain to require any discussion. The company then had no legal or equitable right or power to divert this fund to any other purpose or person, and whoever took it, or any part of it, took it subject to the prior and first right of Wilson. Besides Wilson's clear, legal contract right to this money, his equitable right considered alone was much stronger than that of appellees. He advanced and loaned his money on the faith and credit of this insurance. Appellees were nearly all of them stockholders, officers or directors in the company, and indirectly, if not directly, had received to their own use and benefit this money, in whole, or in part, and they owed at least a moral duty to see to it that this debt was first paid out of the insurance before demanding it for themselves.

Wilson v. Hakes.

As to Riggs and Bentley, they both received the assignments to them by the two Hakes after the fire, and there can be no pretense that they are innocent purchasers or assignees who can be protected. This assignment was a mere transfer of a chose in action, and they took them subject to all defenses of the company and to all the equities of Wilson. Archer v. Ins. Co., 48 Mo. 434; Millon v. Ins. Co., 17 N. Y. 609; May on Ins., Sec. 386.

It is well settled that an agreement by a mortgagor to insure for the benefit of his mortgagee gives the latter an equitable lien upon the proceeds of the policy taken out by the former and embraced in the agreement, and this, too, whether the mortgagor intended the policy for his grantee or not. The law will give effect to his act whether he intends it or not. This is upon the familiar principle that equity regards that done, or will compel that to be done, which ought to be done. Ames v. Richardson, 29 Minn. 330; Carter v. Rocket Ins. Co., 8 Paige, 437; Cromwell v. Brooklyn Fire Ins. Co., 44 N. Y. 42; Millen v. Aldrich, 31 Mich. 408.

When mortgaged property or the improvements thereon are covered by insurance and destroyed by fire, then the money represented by the insurance at once takes the place of the buildings, and represents them under the mortgage, and the money arising from the insurance should be appropriated to the mortgagee.

In The Grange Mill Co. v. Western Assurance Co., 118 Ill. 396, the Supreme Court uses this language: "The principle is of frequent application where a mortgagor or vendee agrees to insure for the benefit of the mortgagee or vendor in case of loss; in equity such party is entitled to the insurance money to the extent, at least, of his interest in the property which was the subject of insurance. After notice to the insurance company having the risk, such company can not pay the loss to the assured named in the policy, except at its peril, until the rights of the parties claiming the fund have been adjusted. Cases in this State and elsewhere recognize this equitable doctrine." Phœnix Ins. Co. v. Mitchell, 67 Ill. 43; Fergus v. Wilmarth, 117 Ill. 542; Wheeler v. Ins. Co., 101 U. S. 439;

Nordyke & Marmon v. Gerry, 112 Ind. 536; Dunlap v. Avery, 89 N. Y. 592; Ried v. McCrum, 91 N. Y. 412.

From these authorities it is very clear that the rights of Wilson, the mortgagor, were prior and paramount not only to the Paper Company, but also to its assigns, and that after notice of Wilson's claim to this fund to the extent of the full payment of his mortgage, the insurance companies had no right to pay the policies to any one else, and, if they did so, it was at their peril.

The attitude and claim of these subsequent beneficiaries under these insurance policies is not different in principle from that of an attaching creditor as against prior *bona fide* purchasers for value in good faith or *bona fide* prior incumbrancers. In such cases the attaching creditor will always be postponed until the prior incumbrancer is satisfied in his legal or equitable demands. Schweizer v. Tracy, 76 Ill. 345; Am. M. U. Ex. Co. v. Willsie, 79 Ill. 92.

The mortgage carried with it the insurable value of the buildings to the extent of protecting Wilson's mortgages, if the insurable value would reach to that extent. In this case the insurable value appears to have been much larger than Wilson's debt.

Counsel for appellees insist that Wilson knew this subsequent insurance was being taken out by the company for the benefit of appellees, and that he did not object, and that he should now be estopped from claiming against them. In the first place, we find no sufficient evidence that Wilson knew that this insurance was being transferred to these parties. But conceding he knew it, he was not bound to object, at least so long as no one was placed in any worse position, or induced to part with his money, by reason of Wilson's silence, or induced to change his position for the worse. Wilson could not be estopped. He had a right to rely on the covenants of his deeds, and so long as he did no affirmative act to mislead appellees and induce them to part with their money, or to assume a worse position than they occupied before, he might keep silent and be safe. Appellees were all bound to know, as a matter of law, that they could take nothing as against

Wilson v. Hakes.

Wilson by taking these policies of insurance, and Wilson was under no moral or legal obligation to inform them that they were getting nothing, so long as they were paying nothing for these policies, except what might remain after he was paid.

On a trial below, the court decreed that Wilson was only entitled to have the proceeds of the $15,000 insurance taken out for his own use, which, when scaled down because of the existence of the other policies to about sixty per cent, amounted to $9,070.42, and also the proceeds of the policies which had been assigned to Holmes Hakes and by him assigned to Riggs, which when scaled down only amounted to $2,998.32.

These two sums added to the net amount realized from the sale of the ground, which was $2,785, made the aggregate sum of $14,853, which Wilson received, being still due him nearly $4,000.

The remaining policies the court directed to be paid to the several persons to whom they had been assigned.

From that part of the decree Wilson appeals, and from that part of the decree directing the interest of Holmes Hakes and William T. Riggs to be paid to Wilson, Hakes and Riggs appeal. So much of the decree as allowed any part of any of these policies to be paid to any of the assigns until Wilson's debt and interest has been fully paid, is erroneous. The decree is further erroneous in making any distinction as between Holmes Hakes and his assignee, Riggs, and the various other claimants to this fund after Wilson has been paid. So far as this record discloses there is no reason why Holmes Hakes should not occupy as favorable a position and relation to the remnant of the money after paying Wilson as any other of the claimants. The mere fact that he took out all of these policies and protected all interest as far as he could and in good faith, furnishes no reason why he should be turned away simply upon a division of the assets of the company after its debts are paid. None of these creditors seemed to have any priority in law or equity over the others. None of them as we have seen have anything but an equitable interest in this fund, and that only after Wilson is paid, and

there seems to be no superior equity in favor of any of them over Holmes Hakes. The decree is also erroneous in compelling Wilson and Riggs and Hakes to pay the costs. The decree will be reversed and the cause remanded. The court will dismiss the cross-bill at the costs of the complainants therein. The court will then ascertain the full amount due complainant, Wilson, under his trust deeds and notes, and will decree that the full face value of all the insurance policies, which were taken out and in force at the time of the fire for the use of Wilson, shall be made good to him out of the proceeds received from all the policies, or for which there is liability on the policies, and that for the balance found due him, which his own policies did not pay, then such balance shall be paid out of the remaining sum so received or to be received from the insurance companies from the various other policies which had been issued to the Paper Company and by them assigned to the various beneficiaries therein named. After Wilson has been fully paid, then the court will divide whatever remains of the proceeds realized from the insurance policies between the several claimants under the assignments, including Holmes Hakes or William T. Riggs, his assignee, in proportion to their several interests.

The court will first direct, however, that before any of the parties claiming the proceeds of the insurance shall receive any part thereof, the costs of the original bill and proceedings therein in the court below shall be paid out of that fund, and out of the remainder the divisions and application to the various parties in interest shall be made as above directed.

*Reversed and remanded.*